The whole point of the guidelines, if they still exist after the Supreme Court rules on them, is that similarly situated defendants should be treated similarly. A corollary of that is what underlies the sentencing arguments in this case, that differently situated defendants should be sentenced and treated differently. The first sentencing argument is that, in fact, that's what section 2B1.1B9C does, that it distinguishes between the category of defendants who read new credit cards and the category of defendants who get copies of existing credit cards. The second sentencing argument is that if section 2B1.9B9C does not distinguish between those categories of defendants, the difference between them is one that could justify a downward departure. I thought that one of the comments to that sentencing guideline would have covered not just getting some new credit line, but also getting duplicate copies of an old one. I grant the language is a little sparse on that, but the comment to it seemed to cover. The commentary, the court's referring to the commentary? Well, the commentary actually talks about there was this new act that was passed by Congress, which has about the Identity Theft and Prevention Act, or whatever the exact title was. And what Congress was concerned about there, and what the commentary recognizes that Congress was concerned about, and what the Sentencing Commission's explanation of the amendment recognizes Congress was concerned about, was this concept of breeding credit cards. And what breeding credit cards means is it means when someone goes out there, they grab your identity, they create a whole new identity, set up their utility bills, get credit cards, whatever the case may be, you never know about it until you go to get a home loan three years later and all of a sudden there's all this outstanding credit and you say, I never had this. So what's the difference if they get a new version of your existing credit card? And they go out and they run up a big bill, and then you go out to get your home loan and you're in the same situation. Because if it's an existing credit card, you find out about it pretty much right away because it's on your credit card statement. For the credit card you already have, you call the bank, you say, this isn't my charges, and it doesn't show up on your credit report because it's acknowledged by the bank it's not your charge. And whether or not, I think it's pretty clear that that's what Congress and the Sentencing Commission had in mind. And the problem with the former is all of a sudden you're out there applying for your home loan, you're in the middle of escrow, and you don't get the home loan and the whole deal falls through. As opposed to the latter where you simply have to call your credit card company and say, this is a mix-up, get the card, you'll see it's not my signature, and so on. I'm not finding in my memo the language that I was thinking of from the commentary. Do you have that? Well, the commentary is quoted in my brief, Your Honor, at, let's see if I can find it quickly, at page, I'm sorry? Page 24, maybe? Yeah, I quote the explanation of the amendment at 25, and I quote the commentary itself at page 24. And what it says is, this subsection focuses principally on an aggravated form of identity theft known as affirmative identity theft or breeding, in which a defendant uses another individual's name, social security number, or other form of identification to breed new or additional forms of identification. The word additional. Pardon me? So if it says new or additional, why wasn't getting an additional card here? Well, I guess you could read it that way, but if you go on to their discussion of the harms that they're concerned about, then they talk about exactly the sort of things I'm talking about, a damaged credit rating or an inability to obtain a loan. That doesn't happen if it's on your existing credit card and you find out on the next statement and you call the bank and say, this is an erroneous charge and I can prove it if you get the credit card slip that won't have my signature on it. So I guess we have, and I'm sorry. I'm not sure it's all, but go ahead. Just make your argument. Well, I take it your argument is that this provision only covers identity theft rather than just credit card theft, and that this is credit card theft? Well, it depends on what you mean by identity theft. But more specifically, it only covers breeding, what they're calling breeding in this commentary. And what I think is pretty clear, if you look at all the legislative history, that what Congress meant by breeding and what the Sentencing Commission means is this concept I'm discussing. Now, my argument is twofold, Your Honor. The first argument is that that commentary, and of course commentary isn't just legislative history, it's just as strong as the guidelines unless it's directly contradictory, that that commentary tells us that this guideline doesn't apply at all. But even if it does technically apply because you give some weight to the word principally and say, well, principally doesn't limit it, so it swings more broadly, that kind of thing, then it's a classic example of a situation where you can have departure. And there's at least three independent arguments that you can make to that effect. First, you can just use the heartland concept, the concept of the typical case, which is, of course, a basic principle of departure jurisprudence. Well, the commentary and the Sentencing Commission tell you that the heartland or the typical case that they have in mind is this breeding type of conduct. The commentary says, generally, the victim does not become aware of the offense until certain harms have already occurred, e.g., a damaged credit rating or an inability to obtain a loan. The explanation of the amendment says, the defendant in an identity theft case typically has exclusive control over the bred means of identification, making it difficult for the individual victim to detect that the identity has been stolen. What sentence did your client get? My client got a year and a day with a range of 12 to 18 months, and the district judge actually indicated that if she'd had discretion under the guidelines, she probably would have given him, like, six to nine months. So we actually have on the record her indicating that if it was up to her, she would have given him some jail time but not as much. But the sentence he got was a year and a day. He's on bond, so we don't have a situation where he's already served it. Should we decide this? Decide the case before the Supreme Court? I filed a motion for a supplemental brief and a supplemental letter about Castro. But that's a little different. I mean, well, maybe. The case has now been argued. His sentence is suspended. What is it? He's going to have to serve a year and a day in jail. He's on bail now. He's on bail? Right. Correct. Okay. So he hasn't started serving it. Correct. I don't see any reason for the court to decide it before the Supreme Court issues its decisions in Booker and Fanfan. And then I'd certainly ask for an opportunity to do supplemental briefing if it seemed appropriate. I'm obviously arguing this in the context of if those cases leave the guidelines surviving. There were major factual arguments made about both this and the law-specific offense characteristic that I think under Amline would require remand, because there were disputed facts that weren't decided by a jury that made the range that high. Both this one and the loss, there was a dispute about whether the loss was over or under $70,000. So there's certainly some Amline and Blakely slash Booker slash Fanfan issues out there. I see I'm running out of time. I've tried to cover the departure argument, the other theories about departure and the search issues in my brief, so maybe I'll reserve the rest for rebuttal.  Thank you. May it please the Court, Byung-Soo Kim for the United States. The Sentencing Commission could easily have drafted the guideline provision that's just been discussed, 2B1.1B9C, in a way to cover, in a way that reflects what the defendant is arguing that it actually says, which it does not. They could have said instead of the guideline applying to offenses where one means of identification is used to obtain any other means of identification, they could have written the guideline to apply where, to read any new means of identification or any other means of identification that didn't exist previously or that was not known to the victim. But the Sentencing Commission did not adopt any of those alternatives. Instead, they adopted the broad guideline language that they adopted, which is that the enhancement should apply whenever one means of identification is used to obtain, quote, unquote, any other means of identification. And I don't think there's any dispute in this case that under that plain language of the guideline provision itself, before we even get to the commentary, the offense conduct in this case does fall under that guideline provision. With respect to the commentary, Your Honors, the defense argues that there's a big difference between cases like this and the cases that were contemplated that were the principal focus, I think, is the words of the commentary of the Sentencing Commission. But first of all, as Judge Gould pointed out, there is that some ambiguity in the commentary about whether it does apply to additional replacement credit cards as well as new credit cards. Second, there's the language that the defense itself concedes exists about the principal focus being this kind of offense called breeding. That necessarily implies that the guideline provision spans a little bit broader. Finally, Your Honors, the defense argues that there's a difference because in a breeding case, the victim finds out right away or very soon after these charges are being fraudulently incurred, whereas in this case, I'm sorry, in a non-breeding case like this one, the victim would find out right away, whereas in a breeding case, that might not occur. Well, it might not occur or it might. The facts of this case themselves illustrate how that line is a very difficult one to draw, and the defense most likely wrote the guideline in a way that made sense to the Sentencing Commission. If you look at the affidavit and the facts in the affidavit, one of the fraudulent victim accounts that is used by the defendant in this case, that would be the Gary Loader account that's referenced in the affidavit. That account had never been used by Mr. Loader, according to the facts of the affidavit, and the defendant was able to proceed to incur or make 17 fraudulent withdrawals, so the government would respectfully submit that this is not a case in which the victim was able to immediately discover that his or her credit card was being fraudulently used. With respect to the departure argument that the defense mentioned, the district court realized and knew that it had discretion to depart. Hence, all of its language throughout its oral ruling about whether this conduct fell within or outside of the heartland. Any such heartland analysis would have been unnecessary if the court really believed that it didn't have any legal discretion to depart. I counted at least seven times when, in the context of analyzing the appropriateness of this downward departure, the court uses the word heartland, and I think that that demonstrates that the court believed that it had discretion to depart, but was refusing to depart because it did not think that a departure was warranted. And the reason it didn't believe such a departure was warranted was because it found that the offense conduct in this case fell squarely within the language of the enhancement provision in this case that we've been discussing, B9C. And because the district court understood that it had discretion to depart downward and declined to exercise that discretion, the government's position is that the downward, the failure or the declination to downward depart is not reviewable by this court under this court's presidency. And so I think that the court would be willing to look at that and to consider a number of other questions, in particular the Rojas-Milan case. Unless the court has any questions on the search warrant probable cause issue. I don't have questions on that, but how do you deal with the Ameline or Blakely or Booker or Fan Fan issues? Well, we haven't dealt with them, Your Honor. We would request an opportunity to brief those issues further in the event that the Supreme Court   And would that be appropriate in this case until they decide it, or what? I think that that would be appropriate given how long the case has been with the Supreme Court and given the fact that I think we are likely to receive a decision from the Supreme Court shortly. Okay. Thank you. I would like you to, I mean, the court says you could make the argument that this is outside of the, you could make the argument that I think I would have the discretion to depart if I felt that, although technically within this guideline it wasn't within the sort of heartland meant by it, but I don't make that argument. I find it's clearly within that. So how can we say that he didn't recognize an ability to depart? Your Honor, other things she said were, quote, as a matter of law, I can't agree with that. Quote, given that legal view. As a matter of law, it's not outside the heartland. Given that legal view, it's hard to see how I could have discretion. I could depart, but it would be wrong. Remember, the test under this court's case law is if there is some doubt in the record or if there is significant ambiguity, there should be remand. I would suggest that there's at the very least that here. I think what the district court was saying, the prosecutor pointed out that she talked about how this was squarely within the language of the guideline. I think what she was thinking was if it was squarely within the language of the guideline, that means it's the heartland and you can't depart. But this court's en banc decision in Sanchez-Rodriguez specifically says, quote, a departure may be warranted even if a specific guideline linguistically applies to the defendant's actions. But she says more than that. She says, I can't say this application of the guideline, quote, is so unusual, so technical or hyper-technical that it strains the guideline section itself. But I think that's, at least in large part, a question of law that's reviewable about the guideline. The Coon case is a very good example of where the court authorized a departure because there was a category of cases clearly expressly covered by the language of the guideline that had a lesser harm involved in it than another category of cases. It distinguished between excessive force cases and unprovoked assault cases. But what language, given her statements that she can't find it's outside the heartland, what's the best language that you think comes from the court that would lead us to conclude that the court felt it could not make a heartland analysis? The best language, Your Honor, that I think shows she was not ruling as a matter of discretion but was finding she couldn't depart and that shows her was really an interpretation of law, is basically the language I quote at pages 6 and 7 of my reply brief. I think I could go through and recite that again, but I'd just be repeating what's in my brief. The case is submitted for decision. We'll hear the next case.
judges: Schroeder, Gould, Clifton